IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 7, 2019

## IN RE AUTUMN L. ET AL.

**Appeal from the Chancery Court for Lewis County**
**No. 2016-CV-45     Michael Binkley, Judge**

_____

### No. M2018-01184-COA-R3-PT

_____

This is a termination of parental rights case involving two minor children.  Appellants, who have custody of the children, appeal the trial court's denial of their petition to terminate Mother/Appellee's parental rights.  The trial court found that Appellants met their burden to show the grounds of persistence of the conditions that led to the children's removal from Appellee's custody and abandonment by wanton disregard by an incarcerated parent.  However, the trial court found that termination of Appellee's parental rights was not in the children's best interests.  We affirm the trial court's findings as to the grounds for termination but reverse its finding as to best interests.  We remand the case for entry of an order terminating Appellee's parental rights to the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Patricia W. Holder, Centerville, Tennessee, for the appellants, Barry C. and Loreita C.[1]

Dana Lloyd Dye, Centerville, Tennessee, for the appellee, Lori B.

Joshua L., Hohenwald, Tennessee, appellee, pro se.

---

[1]  In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

# OPINION

## I. Background

Autumn L. was born in September 2006 to Lori B. ("Appellee," or "Mother") and Joshua L.[2]  Max C. (together with Autumn L., "Children") was born in January 2008 to Appellee and Douglas C.[3]  The Department of Children's Services ("DCS") became involved with this family in December 2008 when it received a referral of drug-exposed children.  Susan Franks, a DCS Child Protective Services worker, investigated the allegations, which involved Lori B. using drugs around the Children and blowing marijuana in their faces to get them to go to sleep.  Meth residue was also discovered in the home, and Lori B. and Douglas C. admitted to domestic violence issues.

In 2009, Douglas C. filed a petition for custody of the Children in the Juvenile Court of Lewis County.  Douglas C. averred that the Children were dependent and neglected due to Mother's drug use.  At the time Douglas C. filed his petition, Mother was not living in his home.  According to Ms. Frank's testimony, Mother and the Children were living with Mother's sister.  Mother ultimately stipulated to dependency and neglect, and the juvenile court awarded Douglas C. custody of the Children by agreed order of August 17, 2009.  The juvenile court awarded Mother supervised visitation and ordered DCS to provide services to Mother.

In August 2011, Douglas C. was arrested on charges of sexual abuse against his daughter, Max's half-sister.[4]  On August 2, 2011, DCS filed a dependency and neglect petition in the juvenile court to remove the Children from Douglas C.'s custody.  Although there is not an order on the petition in our record, it is undisputed that the Children were removed from Douglas C.'s custody and placed with Carolyn H., a paternal great-aunt.  The Children remained in Carolyn H.'s custody until 2014.

The Children attended church with Carolyn H. and met Barry and Loreita C. (together "Appellants") there.  The Children began to sit with Appellants at church.  This progressed to the Children spending time with Appellants outside church.  Appellants, who are both teachers, began to pick the Children up from school.  Eventually, the Children stayed with Appellants on weekends, and the bond between them grew.  In

---

[2] Joshua L.'s parental rights were terminated by default pursuant to the trial court's order of September 26, 2017.  He does not appeal.

[3] Douglas C.'s parental rights were terminated by order of May 30, 2018.  He then appealed to this Court; however, Douglas C. subsequently filed a motion for voluntary dismissal of his appeal under Tennessee Rule of Appellate Procedure 15(a).  By order of September 26, 2018, this Court granted Douglas C.'s motion, thereby dismissing him from the appeal.

[4] A jury subsequently convicted Douglas C. of four counts of rape of a child, and he was sentenced to twenty years on each count to run consecutively.  At the time of the hearing, he was incarcerated.

2014, Carolyn H. approached Appellants and asked them to take the Children due to Carolyn H.'s age and health issues.

On August 27, 2014, Appellants filed petitions, in the juvenile court, seeking custody of the Children. Mother waived an adjudicatory hearing, agreeing that the Children were dependent and neglected. On December 3, 2014, the juvenile court entered an adjudicatory order, finding that the Children were dependent and neglected and placing custody with Appellants; Mother was awarded supervised visitation. The Children have remained in Appellants' home since that time.

DCS Family Support worker, Cynthia Primm, was assigned to the Children's case to facilitate supervised visitation, drug screens, and other services for Mother. Ms. Primm was also charged with facilitating mental health evaluations for the Children. Ms. Primm scheduled a meeting to establish a visitation plan, but Lori B. did not attend. On February 13, 2015, at a post-dispositional hearing, Ms. Primm attempted to conduct a drug test on Mother. After Ms. Primm requested the drug test, Lori B. left the courthouse and did not return. The juvenile court ordered the Children to remain in Appellants' custody. DCS was granted leave to close its case with no further services to Mother because of her noncompliance with DCS.

Appellants have been married since 2003. Loreita C. is a second grade teacher, and Barry C. teaches high school math to special education students. A January 2, 2016 home study, which was filed with Appellants' petition for termination of parental rights and adoption, indicates that Appellants have a stable and loving home. The Children are safe, and all of their needs are met. Since the Children came to live with Appellants, Loreita C. has given birth to the Appellants' biological child, who was eight months old at the time of the hearing. The Children consider the baby to be their brother, and they call Appellants "mom" and "dad." The Children are involved in many extracurricular activities and sports, and they have bonded not only with Appellants but also with Appellants' extended family.

The Children's Mother, Lori B., has a protracted history of drug use and criminal activity. At the time of the hearing on the petition to terminate her parental rights, Mother was thirty years old. She candidly admitted to illegal drug use, specifically methamphetamine and marijuana, since age eighteen. Lori B. and Autumn began living with Douglas C. in 2006, when Autumn was approximately one month old. They lived together until approximately 2009, when Mother and the Children moved in with Mother's sister and Douglas C. filed his petition for custody of the Children, *see supra*. Despite Douglas C.'s arrest on four counts of rape of a child, Lori B. moved back in with Douglas C. and lived with him from 2011 until April 2014, when she was incarcerated. Douglas C. was later convicted of the four counts of rape of a child. At the hearing on the petition to terminate her parental rights, Mother testified that she did not believe Douglas C. was guilty of the offenses for which he was convicted.

Concerning Lori B.'s criminal history and incarcerations, on October 4, 2010, she pled guilty to the charge of promotion of the manufacture of methamphetamine in Maury County and was placed on diversion. On December 1, 2011, her diversion was revoked, a four-year sentence was imposed, and she was placed on probation. On December 6, 2012, her probation was revoked and extended for an additional six months; on June 14, 2014, her probation was again revoked and extended. Mother's repeated revocations were all due to failed drug tests.

Lori B. testified that by March of 2014, she was in "active addiction." On March 26, 2014, Mother was arrested, in Lewis County, and charged with possession of drug paraphernalia, resisting arrest, and assault. In April 2014, Mother was incarcerated in Maury County; she was released in September 2014. From the time of her release until approximately January 2015, she lived with a friend. In January 2015, Mother moved in with her boyfriend, Bob Z. While living with Bob Z., Mother testified that she relapsed on methamphetamine and alcohol.

Mother's last supervised visit with the Children occurred on January 11, 2015. On April 11, 2015, Lori B. went to Appellants' home, where she had some interaction with the Children, who were playing outside. Loreita C. testified that Mother threatened to take the Children and that the Children were very frightened by Mother's behavior. Loreita C. called the police, and Lori B. was arrested for aggravated criminal trespass. Thereafter, Mother committed several additional criminal acts in Lewis County. On April 17, 2015, she broke windows out of two vehicles, for which she was charged with vandalism over $1,000. On April 19, 2015, Mother committed aggravated burglary of a home. She stole the homeowner's vehicle, for which she was charged with theft over $10,000. At the time of her arrest, Lori B. was also charged with driving on a suspended license. She was remanded to jail on April 20, 2015. On July 15, 2015, Lori B. pled guilty to all of the Lewis County charges and was incarcerated until July 2017.

While incarcerated, Lori B. sent letters to the Children and called them. The Children, however, have expressed their desire to have no further contact with her. At the September 2017 hearing, Mother testified that she is still an addict, but she is in recovery. On or about July 21, 2017 (approximately one month before the hearing), Lori B. entered a rehabilitation program. At the time of the hearing, she was living in a "re-entry" facility and testified that the facility would not allow children to live there. Mother further testified that she attended at least four NA/AA meetings per week, along with counseling and therapy. Mother testified that she was on "Step 2" of her twelve-step program, and she expected to complete the program on January 21, 2018. At the time of the hearing, Mother had passed all drug tests administered as part of her recovery program. There is no evidence concerning whether Mother, in fact, completed the program successfully. The trial court's final order notes that no motion was filed to reopen proof on this question.

While Mother was incarcerated in Lewis County, on April 28, 2016, Appellants filed their initial petition for termination of her parental rights and for adoption. Appellants were granted leave to file an amended petition on August 21, 2017. As grounds for termination of Mother's parental rights, Appellants alleged: (1) abandonment by willful failure to visit and support; (2) persistence of the conditions that led to the Children's removal from Mother's custody; and (3) abandonment by an incarcerated parent by wanton disregard. Counsel was appointed to represent Mother, and a guardian ad litem was appointed for the Children.

The hearing on Appellants' petition took place on September 26 and 27, 2017. By order of May 30, 2018, the trial court found that Appellants had met their burden to show, by clear and convincing evidence, the grounds of persistence of the conditions that led to the Children's removal and abandonment by an incarcerated parent by wanton disregard. Although the trial court found grounds for termination of Mother's parental rights, the court ultimately held that termination of her rights was not in the Children's best interest and denied Appellants' petition. They appeal.

## II. Issues

There are two dispositive issues:

1. Whether the trial court erred in finding that Appellants met their burden to prove at least one ground for termination of Appellee's parental rights.

2. Whether the trial court erred in finding that Appellants failed to meet their burden to show that termination of Appellee's parental rights is in the children's best interest.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. §§ 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B*., 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

### IV. Grounds for Termination of Parental Rights

As noted earlier, the trial court found that Appellants met their burden to show two statutory grounds for termination of Appellee's parental rights: (1) persistence of the conditions that led to the Children's removal from Appellee's custody, Tenn. Code Ann. § 36-1-113(g)(3); and (2) abandonment by an incarcerated parent by wanton disregard, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(iv). Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review both of the foregoing grounds.

### A. Persistence of the Conditions that Led to the Children's Removal

Tennessee Code Annotated Section 36-1-113(g)(3) provides that termination of parental rights may be based on persistence of conditions. Persistence of conditions is defined as:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H*., 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

In *In re Audrey S.*, this Court held that, "based on the statutory text and its historical development, [the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1-113(g)(3)] applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn. Ct. App. 2005). Here, the Children were removed from Mother's custody in 2009 under an order finding the Children to be dependent and neglected. As discussed above, the finding of dependency and neglect was based on Mother's illegal drug use and inability to provide the Children a suitable and safe home.

Concerning this ground, in its May 30, 2018 order, the trial court found, in relevant part:

The record here clearly establishes [Mother's] addiction is significant, as evidenced by her past relapses. In addition, [Mother's] living situation in the recovery facility prevents her from permitting the children [to reside] with her in her current residence. It appears to this Court, further, the remaining factors for this particular ground have been satisfied by the [Appellants]. [Mother's] continued struggles with her addiction do constitute a persistence of condition which does not appear to this Court to be able to be remedied [at] an earlier time to allow the children to return to [Mother's] custody. Additionally, the record is clear the children's current living situation is in a state of flux, thus preventing the children from

integration into a safe, stable, and permanent home.

The record supports the trial court's findings. The Children have been removed from Mother's custody since 2009. At the time of removal, Max was one year old, and Autumn was three. In her testimony, Mother was candid about the fact that she has abused drugs since at least the age of eighteen. She testified concerning her struggles with sobriety and relapses. Clearly, Mother's drug abuse has contributed to the criminal charges she has accrued since 2010. Mother testified that she was in "active addiction" when she was arrested on these charges. Through diversion, probation, and incarceration, she has had many opportunities to address her substance abuse issues so as to be able to parent these Children. She has been provided services by DCS. The record, however, clearly shows that during the eight years (at the time of the hearing) the Children had been in the custody of others, she has shown a pattern of recidivism as to both her criminal activity and drug use. In fact, the record shows that she has only recently attempted to seriously address her drug use by entering treatment, on July 21, 2017, after her release from incarceration. While we certainly give Mother credit for her decision, there is no evidence to show that Mother's sobriety is permanent. *See, e.g., **In re Victoria H.**,* No. M2017-01162-COA-R3-PT, 2018 WL 1092156, *10 (Tenn. Ct. App. Feb. 27, 2018) ("Father's recidivism and frequent returns to jail do not bode well for his ability to provide a long-term home for the Child."). Here, Mother has an admitted history of relapse. Her mother, Crystal B., testified that Lori B. attempted drug rehab in the past, sometime in 2010 or 2011, but she did not complete the program. Furthermore, there is no evidence that Mother has successfully completed the program she entered in July 2017, nor is there any evidence concerning Mother's current living situation. At the time of the hearing, she was living in a re-entry facility that did not allow children to reside there. Mother's testimony shows that when not incarcerated, her living situation is rather transient. After release from incarceration in Maury County, she stayed with a friend and then moved in with Bob Z. before relapsing and incurring more criminal charges.

Perhaps the most compelling evidence concerning Mother's inability to permanently remedy the conditions that led to the Children's removal comes from the Children themselves. The Children gave their testimony with only the trial judge and the attorneys present. Autumn, who was eleven at the time, testified:

A. . . . I don't think that [Mother] will change because she keeps saying she will, but she never does. (Gets emotional).
Q. Have you been aware that in the past she's said she was going to change? Has she ever said she's going to change in the past?

A. Yes, she has.

Q. Okay. And you don't think she ever will?

A. I don't think so.

Q. Okay. So it kind of makes it hard to trust this time if she's going to change?

A. It does.

Q. Would you like to see her change.

A. I would.

(Parenthetical in original).

Meanwhile, the evidence clearly establishes that the Children have, for perhaps the first time in their lives, found a safe, stable, and permanent home with Appellants. As discussed in detail below, they have both expressed their desire to no longer have contact with Lori B. and to remain with Appellants. It is clear from a review of the Children's respective testimony, that the prospect of seeing Lori B. causes them worry and stress. Appellants have petitioned to adopt Max and Autumn. Based on the foregoing discussion, we agree with the trial court that the continuation of their relationship with Lori B. will greatly diminish their ability to integrate into Appellant's home and, as such, will cause them undue anxiety. Accordingly, we affirm the trial court's finding that Appellants have met their burden to show that the conditions that led to the Children's removal persist.

## B. Abandonment by an Incarcerated Parent by Wanton Disregard

Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

***

(iv) A parent ... is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent ... has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and ... the parent ... has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

- 9 -

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Tennessee Code Annotated Section 36-1-102(1)(A)(iv) applies only where "the parent ... has been incarcerated during all or part of the four (4) months immediately preceding the institution of [a parental termination] proceeding." *See In re Keith W.*, No. W2016-00072-COA-R3-PT, 2016 WL 4147011, at *6 (Tenn. Ct. App. Aug. 3, 2016) (holding that the incarcerated parent definitions for abandonment did not apply because the father was not incarcerated at or in the four months preceding the filing of the termination petition); *In re Navada N.*, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *14 (Tenn. Ct. App. May 23, 2016) (describing incarceration within the four months preceding the filing of the termination petition as a "condition precedent" to the application of the abandonment definitions under section 36-1-102(1)(A)(iv)). Here, Appellants filed their petition for termination of Appellee's parental rights on April 28, 2016. Appellee testified that she was incarcerated from April of 2015 until July of 2017. Accordingly, the threshold criterion for application of this ground is met.

Concerning what constitutes wanton disregard, for purposes of this ground, this Court has explained that:

> Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009). We further note that the ground of abandonment by wanton disregard does not require that the conduct at issue occur within the four months prior to incarceration. *In re Audrey S.*, 182 S.W.3d at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."). Rather, Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero. *See In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017) ("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated."); *but* see *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn.

- 10 -

Ct. App. June 9, 2015) (concluding that father's actions that led to his incarceration did not constitute wanton disregard for the child's welfare because father did not know that mother was pregnant with his child). "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, 2015 WL 3611244, at *3.

The trial court made the following specific findings concerning the ground of abandonment by an incarcerated parent by wanton disregard:

> [Appellee's] criminal history . . . clearly establishes [that Appellee] has been given opportunities by the courts to reevaluate her choices, but instead, fell back into a pattern of drug abuse and criminal activity. This activity clearly indicates a wanton disregard for the welfare of her children by her continued, persistent abuse of drugs and by incurring new criminal charges even after being granted probation.
> Therefore, the Court finds this statutory ground for termination of parental rights has been established by clear and convincing evidence.

The record supports the trial court's findings. We have previously discussed Mother's recidivism and relapse issues. From the record, Mother's criminal activity began after the Children were born, i.e., in 2010. By her own testimony, her illegal drug use also increased after Autumn and Max were born. As noted by the trial court, Mother has been given ample opportunity to change her life. She was granted diversion, which was revoked due to drug use. She was granted probation, which was revoked due to drug use. She was incarcerated in Maury County but accrued additional criminal charges in Lewis County after her release. Only after her incarceration in Lewis County and the filing of the petition to terminate her parental rights has Mother attempted to complete a drug rehabilitation program.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). As the Tennessee Supreme Court recently explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must

- 11 -

remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D*., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case, to-wit:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines . . . ;

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. §§ 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White*, 171 S.W.3d at 194.

As set out in its May 30, 2018 order, the trial court considered all of the foregoing statutory factors except number 8 (which the trial court found inapplicable based on the lack of evidence concerning Mother's mental health). The trial court ultimately concluded that

> [a]lthough it is readily apparent to this Court it is not in the best interests of the children to presently be reunited with their biological parents in a permanent living environment, the Court is not convinced the termination of the parental rights of [Mother] is in the children's best interests. It appears to this Court [that Mother], although [she has] admittedly made significant mistakes in her past, is on the road to recovery. The Court notes the desires of the children to remain with the [Appellants]; however, the preferences of the children are not the standard required by the statute. Rather, the Court must make its analysis based upon the clear and convincing evidence of the best interests of the children. The Court finds the [Appellants] have not satisfied this incredibly high standard of proof by proving the best interest of the children are satisfied by the termination of the parental rights of their biological mother. . . .

Based on its conclusion that termination of Mother's parental rights is not in the Children's best interests, the trial court denied Appellants' petition as to Mother.

Turning to the record and the trial court's specific findings regarding the statutory factors, we agree with the trial court's conclusion that Mother has maintained contact with the Children under factor three. The evidence shows that, during her incarcerations, Mother continued to contact the Children through calls and letters. After her release, she attempted to see them, although she was not always successful—either due to timing or to the Children not wanting to see her. She has provided them with gifts, which appear to be consistent with her means. Unfortunately, this is the only statutory factor that weighs in Mother's favor. Despite Mother's attempts to remain relevant in her Children's lives, the proof shows, under statutory factor four, that no meaningful relationship has been established between them.

Although, as set out in context above, the trial court gave little consideration to the Children's testimony, after review, we conclude that their respective statements are quite compelling. Max, who was nine at the time of his testimony and one at the time he was removed from Mother's custody, testified that, "I don't think I really ever lived with [Mother]." He referred to Mother as "Lori" and to Appellants as "mommy" and "daddy." Max adamantly insisted that he "didn't want to live with Lori and that [he wanted] her to leave him alone." Likewise, Autumn, who was eleven at the time of the hearing and three when she was removed from Mother's custody, stated that she did not want any further contact with Mother "[b]ecause she doesn't feel like a real mother to me because she never has been." The evidence corroborates Autumn's statement. As discussed above, the Children were removed from Mother's custody at an early age and have little or no memory of living with her. They have had only sporadic contact with her throughout their lives. As such, they do not have a meaningful relationship with her.

Concerning factor six, whether a person residing with the parent has shown sexual abuse toward a child, the trial court noted the fact that "[a]lthough [Mother] did not live with [Douglas C.] at the time of the abuse [i.e., four counts of rape of a child, his own daughter], she did subsequently move back in with him after her release from custody, and [Mother] has expressed she believes [Douglas C.] is innocent." The trial court simply concludes that these facts "weigh[] against . . .[Mother]." Mother's statements raise a more urgent concern in this Court's mind. The mere allegation of such conduct on the part of Douglas C., much less the fact that he was convicted of these crimes by a jury, would raise, in any reasonable parent, an impetus to protect his or her child from this man. Appellee, however, knowing the allegations against Douglas C., moved into his home and protests his innocence even at the hearing to terminate her parental rights. So, while we agree that this factor weighs against her, we further conclude that it shows a lack of reasoned judgment and protective impulse that a parent must have.

As to factor seven, concerning Mother's living situation, and factor nine, concerning the payment of child support, the trial court correctly concluded that these factors weigh against Mother. It is undisputed that at the time of the hearing, she was living in a re-entry facility where the Children could not reside. As discussed in detail above, Mother's ability to provide a suitable home has not been shown. It is also undisputed that Mother has not paid any support for these Children. Mother has had only sporadic employment, and there is no evidence that she has maintained any job for more than a few weeks or a month. Nonetheless, when she had employment, she did not attempt to provide any support. We note that she was employed at a local restaurant at the time of the hearing on the petition to terminate her parental rights; however, as with the housing, there is no proof of long-term, stable employment.

After our review of the record, we are most troubled by the trial court's holdings regarding statutory factors one and two. As to the question of whether Mother has made an adjustment of circumstance, conduct or conditions as to make it safe for the Children to be in her home, the trial court found:

> As to [Mother], it appears as though this factor may weigh in her favor. At the time of the September 2017 hearing, [Mother] was residing in a recovery facility, addressing her drug addictions, maintaining employment . . . and developing habits that will, hopefully, address her addiction. [Mother] admits she is an addict, but she has started the process to make changes to her lifestyle in order to address the issues. [Mother] attends four NA/AA meetings a week and goes to four classes during the week for counseling, therapy and dialectical-behavior therapy. Although there is not any evidence in the record, [Mother] anticipated completion of her re-entry program was January of 2018. Although at the hearing [Mother] admitted she was not yet at a place in her recovery to provide a home for her children, she has been taking steps to adjust her circumstances in order to be able to provide a safe and suitable living situation for the children.

Concerning factor two, whether Mother "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible," the trial court's order states that "this Court is under the impression [Mother] is making the strides to create a lasting adjustment to her condition. This is evidenced by the factors discussed above. Therefore, this fact, again, appears to weigh in her favor." We disagree.

As discussed above, in reaching its conclusion that the Appellants met their burden to show the grounds of persistence of conditions and abandonment by wanton disregard, the trial court relied on the same set of facts that it relied on in its best interests analysis. The trial court held that the same facts met the clear and convincing standard *vis-à-vis* the grounds for termination but found that these same facts did not provide clear

and convincing proof that termination of Mother's parental rights is in the Children's best interests. This Court has explained:

> The term best interest is not defined by statute. With regard to best interest, Corpus Juris Secundum: Infants states:
>
>> As a general rule, the best interests of the child concerned are an important consideration where the termination of parental rights is sought, and, in fact, have been described as the primary or paramount consideration.... The same factors which show parental inability may also show that the termination of parental rights would be in the children's best interest.
>
> 43 C.J.S. Infants § 22 (2012). Thus, the grounds for termination themselves may also show that termination is in the child's best interest.

*In re Dominique L.H.*, 393 S.W.3d 710, 717 (Tenn. Ct. App. 2012). As discussed above, the burden is the ultimately the same for both inquiries, yet the trial court refers to the standard in its best interest analysis as "incredibly high." From the conflicting rulings, we conclude that the trial court applied a higher standard of proof than clear and convincing to the best interests analysis. Having determined that the trial court's rulings regarding the grounds were correct, we now conclude that its rulings regarding best interests are not.

To put a finer point on it, best interest factors one and two are written as *faits accomplis*, i.e., things that have been accomplished and are presumably irreversible. Specifically, these statutory factors ask the court to consider whether the parent "**has made** such an adjustment. . ." and whether the adjustment is permanent. Based on its statements, *supra*, it appears that the trial court focused its best interests analysis on Mother's recent attempt at sobriety but did not weigh her past behaviors, relapses, and recidivism. As discussed in detail above, Mother has been given ample opportunity to change her destructive patterns. Despite these opportunities, the record shows that Mother's decision to enter the drug treatment facility was made only after Appellants filed their petition to terminate her parental rights and only two months before the hearing thereon. However, the sole evidence of her enrollment in this treatment program is from Mother's own testimony, and there was no corroborating evidence. Likewise, there is no evidence that any recovery she may achieve in the program will be permanent; this is especially so in view of her admitted relapses after previous attempts at sobriety. In *In re T.G.A., et al.*, No. E2014-01195-COA-R3-PT, 2015 WL 381478 (Tenn. Ct. App. Jan. 29, 2015), this Court affirmed the termination of a father's parental rights to two children. Concerning the children's best interests, and specifically statutory factors one and two, this Court noted that

- 16 -

the proof gave no indication of a lasting adjustment or change of circumstances on Father's part with respect to his admitted drug abuse. Inpatient treatment was not successful and the only "proof" that he recently ended his drug use was Father's uncorroborated testimony. Father's failure to address his drug problem until the "eleventh hour" left him unable to provide any evidence that he could do the other things necessary to regain custody including providing a safe, stable home for the Children and an income to support the Children's needs.

*In re T.G.A., et al.*, 2015 WL 38178, *5. The same is true here.

While Mother has relapsed and accrued more criminal charges, the Children have been moved from home to home—first with Douglas C. and then with Carolyn H. Now, in Appellants' home, they have found stability and safety. Appellants want to adopt these Children, and both Children testified that they wish to stay with Appellants permanently. They consider Appellants to be their parents, and they are bonded with their new brother and their extended family. They are adamant that they want no further contact with Lori B., and it is clear from their testimony that contact with Lori B. causes them anxiety. These Children deserve a peaceful home, which they have found with Appellants. To make any change to that situation would clearly cause them emotional and psychological damage. Accordingly, we reverse the trial court's holding that termination of Lori B.'s parental rights is not in the Children's best interests, and we remand the case for entry of an order terminating her parental rights.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's holdings as to the grounds of persistence of the conditions that led to the Children's removal and abandonment by wanton disregard. We reverse the trial court's holding that termination of Appellee's parental rights is not in the Children's best interests. The case is remanded for entry of an order terminating Appellee's parental rights to the Children and for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellee, Lori B., for all of which execution may issue if necessary.

_____

KENNY ARMSTRONG, JUDGE